TARA B. OWEN *vs.* SIDNEY KESSLER, trustee[1]
(and a companion case[2]).

Nos. 01-P-32 & 01-P-184.

Barnstable. September 5, 2002. - November 15, 2002.

Present: GRASSO, KANTROWITZ, & COWIN, JJ.

*Real Property,* Sale, Purchase and sale agreement. *Contract,* Sale of real
estate, Construction of contract, Offer and acceptance, Condition, Waiver,
Implied covenant of good faith and fair dealing.

A buyer of real estate who had submitted a "back-up" offer to purchase,
contingent upon an earlier sale of the same property failing, was entitled to
specific performance, where the prior offer to purchase stating that "[t]ime
is of the essence" and containing an agreed-upon time for performance,
which was not met, reflected the parties' intention to be bound by that
document [469-470]; where there were no words or conduct that established
a waiver of the "time is of the essence" clause [470-471]; and where the
seller's rejection of the first buyer's late delivery of a purchase and sale
agreement did not cause a breach of the implied covenant of good faith
and fair dealing, but enforced the bargained-for "time is of the essence"
clause negotiated by the parties [471-472].

CIVIL ACTIONS commenced in the Superior Court Department
on October 8, 1997, and June 3, 1998, respectively.

The cases were heard by *Richard F. Connon,* J.

*John R. Costello* for Tara B. Owen.

*William F. Riley* for Steven B. Wardle.

KANTROWITZ, J. The lesson to be learned from this real estate
deal gone bad is a simple one: a "time is of the essence" clause

[1]Of the Hammond House Realty Trust.

[2]Steven B. Wardle *vs.* A.S. Nason, trustee of the Hammond House Realty
Trust. (Although A.S. Nason was named in Wardle's complaint as trustee of
the Hammond House Realty Trust, it appears that the trustee of that trust is
Sidney Kessler. At oral argument it was indicated that the misidentification
was an oversight that should have been addressed by a corrective motion in
the trial court. Kessler defended throughout.)

means that contractual deadlines will be strictly enforced. A waiver of a deadline will not be found unless one is demonstrated by the actions of the parties. See *McCarthy* v. *Tobin*, 429 Mass. 84, 88-89 (1999).

*Facts.* Tara Owen and Steven Wardle both wished to purchase real property at 410 Main Street, Chatham, owned by Sidney Kessler (as trustee for the Hammond House Realty Trust). Owen rented the premises, where she lived and operated a gift shop, Mermaids on Main. Next door, at 402 Main Street, Wardle owned a goldsmith business. The 410 Main Street property had been on the market for approximately one year.

As Owen was deciding whether she could afford to purchase the property,[3] Wardle himself was contemplating expansion. Deciding to expand, but wishing to remain anonymous, Wardle acted through a broker, Thomas Patten, and an attorney and friend from New York, Christopher Zito. Through real estate brokers, Patten for Wardle and Ronald Rudnick for Kessler (Rudnick's uncle), a deal was negotiated.

A standard Cape and Islands Real Estate Board offer to purchase (OTP) form was prepared by Patten and signed, on September 12, 1997, by Zito "as agent" and Rudnick as "agent for trustee." The pertinent terms included: "The parties hereto shall, on or before 11:00 A.M. on September 26, 1997, execute a Purchase and Sale [P&S] Agreement which when executed, shall be the Agreement between the parties hereto"; and "Time is of the essence hereof." An addendum to the OTP contemplated the buyer conducting an inspection of the premises "on or before the date of September 26, 1997" (the same date for the execution of the P&S agreement).

As this was transpiring, Owen decided to make an offer on the property, a decision she shared with Wardle. In response, he informed her that not only was he also interested, but that he had already made an offer on the property, which had been accepted. Needless to say, this had an immediate and pronounced adverse effect on their relationship.

Owen approached Rudnick, who confirmed that an offer to

---

[3]Owen testified that her decisional process included seeking advice from Wardle; Wardle conversely testified that, while they did speak, he had no knowledge of her interest in that particular piece of property.

purchase had been signed on the property. After some conversation, she submitted a "back-up" OTP, contingent upon the first sale failing. The purchase prices of the two offers to purchase were identical. Wardle and Patten were not aware of this second OTP.

In preparation for the Wardle sale, a building inspection was to be scheduled. Fearing some inability to do it on a timely basis — the parties would have to deal with the property's current tenant, Owen — Rudnick mentioned to Patten that there might need to be an extension. Patten approached Owen on two occasions, on September 19 and 20, to make the arrangements. Owen told him she could not talk to him, however, as she was busy with customers. On the following Monday, September 22, Patten informed Rudnick of his difficulties and the two again discussed the possibility of a short extension for the inspection[4] to be completed. As it turned out, however, no extension was needed, the building inspection being completed on September 24.

At some point, Patten sent Zito a standard P&S agreement, to which Zito made some changes. Upon being informed of the completion of the inspection, Zito signed the document, once again "as agent," and sent it by overnight mail to Patten; it arrived between 10:30 A.M. and 10:45 A.M. on September 26. Upon receipt of the document, Patten, instead of delivering it forthwith to Rudnick's office, which was four minutes away, by the 11:00 A.M. deadline, sat down to type a cover letter and to make several phone calls. After the 11:00 A.M. deadline had passed, Rudnick called Patten and said Patten "had not delivered [the P&S agreement] by eleven o'clock and, therefore, [Rudnick] sold the property to someone else." At this point, the time being approximately 11:15 or 11:20 A.M., Patten left his office to deliver the P&S agreement to Rudnick.

Wardle sued Kessler for specific performance. Owen, having sought unsuccessfully to intervene in Wardle's action, also

---

[4]Patten testified that an extension for an inspection included an extension for the execution of the P & S agreement.

brought suit against Kessler for specific performance.[5] The cases were considered together in a jury-waived trial. The trial judge found for Wardle, concluding that (1) the seller had waived the "time is of the essence" clause by breaching the duty of good faith and fair dealing; (2) the proposed P&S agreement proffered by Wardle's agent was essentially in full compliance with the terms of the OTP; and (3) Owen's motion for reconsideration was without merit. Owen appealed.[6] We agree that there was error on the first point and therefore, without reaching the other points, we reverse.

*Time is of the essence.* Wardle's OTP provided that "[t]ime is of the essence hereof." Further, his OTP stated that the P&S agreement was to be executed by 11:00 A.M. on September 26.

Under Massachusetts law, parties will be held to the deadlines they have imposed upon themselves when they agree in writing that time is to be of the essence. *McCarthy* v. *Tobin*, 429 Mass. at 88; *Vickery* v. *Walton*, 26 Mass. App. Ct. 1030, 1031 (1989). The deadline is a condition subsequent, and if the condition subsequent is not met (i.e., an executed P&S agreement), or waived, then the parties' obligations to each other are extinguished. *McCarthy* v. *Tobin, supra.*

In the case at bar, Wardle's OTP stated that "[t]ime is of the essence" and contained an agreed-upon time for performance, which was not met. If the parties were inclined to insert a specific time and date in their agreement as a deadline, they ought to be held accountable for that. To hold otherwise, under these circumstances, would render "time is of the essence"

---

[5]Owen should have been allowed to intervene. As a real party in interest, Owen could have appealed the denial of her motion to intervene. By suing Kessler, she was in effect suing someone with whom she theoretically had a commonality of interest. In Owen's suit, Kessler unsuccessfully sought to compel joinder of Wardle as a defendant.

[6]The trial judge issued a single memorandum of decision applicable to both cases, but separate judgments (a judgment for Wardle in his suit for specific performance and a judgment against Owen in her suit for specific performance). Owen appealed from the judgment in her suit and filed a motion to stay the judgments in both suits, which motion was denied in the trial court. Owen sought interlocutory relief from the denial and a single justice of this court allowed the stay. Wardle's appeal (No. 01-P-32) is from the single justice order. Given our decision on the merits of Owen's appeal, we dismiss Wardle's appeal as moot.

clauses meaningless. Once 11:00 A.M. passed, the seller no longer had an obligation to the buyer.[7]

*Waiver.* Conditions and clauses of a contract may be waived, either expressly or by words and conduct. See *McCarthy* v. *Tobin, supra* at 88-89, citing *Church of God in Christ, Inc.* v. *Congregation Kehillath Jacob*, 370 Mass. 828, 832, 834 (1976). In *McCarthy*, a waiver was established by the conduct of the parties as they continued to deal after the expiration of the deadline.[8] In *Church of God in Christ, Inc.* v. *Congregation Kehillath Jacob, supra* at 832-835, a waiver was established by the acceptance of payments and continued dealings between the parties after the deadline. In both instances, the evidence of conduct constituting waiver was unassailable.

In the present case, by contrast, there were no words or conduct that established waiver of the "time is of the essence" clause. While there had been conversation about the possibility of an extension to accomplish the inspection, there was no need for one, as the inspection occurred prior to the contractual deadline. A seller's indication that he is willing to grant an extension if one is needed is different from actually granting one; nor does such an indeterminate expression automatically constitute a waiver of the time is of the essence clause, especially where the anticipated reason for the extension does not materialize. While Patten may have believed time was not of the essence due to Rudnick's apparently lackadaisical approach to the subject of an extension, Patten's subjective belief

---

[7]The trial judge found the delay in the delivery of the P&S agreement, of approximately fifteen to twenty minutes, de minimis. As matter of law, we disagree. Here, after the deadline, it was the seller who called the buyer, indicating that the deadline had expired and the deal was off, at which point the buyer sought to deliver the P&S agreement, unsigned by the seller. We need not decide whether, upon different facts, a failure to comply with a time is of the essence provision may be disregarded as de minimis.

[8]"[The seller's] lawyer, acting as her agent, voluntarily undertook the task of drafting the purchase and sale agreement. He did not produce the first draft until it was impossible for [the buyer] to sign it before the deadline. He also did not object to the passage of the deadline in the telephone calls and facsimile transmissions that followed. Instead, he continued to deal with [the buyer's] lawyer in an effort to craft a mutually satisfactory agreement. In the only express communication concerning the execution of the agreement, [the seller's] lawyer implied that a date later than [the deadline] was satisfactory." *McCarthy* v. *Tobin*, 429 Mass. at 88-89.

does not alter the parties' written agreement. To demonstrate waiver, the evidence must be more compelling, as in *McCarthy*. It was not in this case.

*Covenant of good faith and fair dealing.* The trial judge determined that Rudnick, as agent for the defendant, was in breach of the implied covenant of good faith and fair dealing by not accepting the P&S agreement shortly after the stated deadline, and that therefore Rudnick waived the time is of the essence clause. We disagree. The seller's rejection of the late delivery of the P&S agreement did not cause a breach of the implied covenant of good faith and fair dealing; rather, it enforced the bargained-for "time is of the essence" clause negotiated by the parties.

In Massachusetts, every contract is subject to an implied covenant of good faith and fair dealing. *Anthony's Pier Four, Inc.* v. *HBC Assocs.*, 411 Mass. 451, 473 (1991). "The implied covenant of good faith and fair dealing provides 'that neither party shall do anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract . . . .' " *Id.* at 471, quoting from *Drucker* v. *Roland Wm. Jutras Assocs.*, 370 Mass. 383, 385 (1976).

In *Anthony's Pier Four*, the court wrote:

> "The judge found that a number of the positions and actions taken by Anthony's, culminating with the purported disapproval of the BRA master plan, were designed to 'forc[e] financial concessions from HBC.' Anthony's approval was crucial to HBC's efforts to obtain financial backing as well as governmental permits and approvals. Knowing that it thus could apply pressure on HBC, Anthony's withheld its approval in an attempt to force HBC to sweeten the deal. Anthony's use of a discretionary right under the agreements as a pretext justifies the judge's ruling that Anthony's breached the covenant of good faith and fair dealing."

*Id.* at 472-473.

Here, in clear contrast, there was no pretextual use of any discretionary right. The buyer's reasonable expectations were defined by the express "time is of the essence" clause, and the

implied covenant of good faith and fair dealing did not alter that express understanding. Further, there is no evidence of any clandestine attempts by the seller to sabotage any aspect of his deal with Wardle. The seller gained no advantage by selling to Owen as opposed to Wardle. The seller simply sat back, did nothing, and waited for the agreed-upon deadline to come. Once it passed, he called off the deal, as was his right under the contract.

The judgments in both Wardle's and Owen's cases are reversed. We remand to the Superior Court for entry of a judgment in favor of Owen on her complaint for specific performance and of a judgment against Wardle on his complaint for specific performance. (Wardle's appeal from the single justice order is dismissed as moot. See note 6, *supra*.)

*So ordered.*